1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES  DISTRICT COURT**

Northern District of California

San Francisco Division

SAMIRA GUCCIONE, et al.,

              Plaintiffs,

    v.

JPMORGAN CHASE BANK, N.A.,

              Defendant.

_____/

No. 3:14-cv-04587 LB

**ORDER GRANTING IN PART AND DENYING IN PART CHASE'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

[Re: ECF No. 16]

### INTRODUCTION

Plaintiffs Samira Guccione and Susan Salehi-Had sued JPMorgan Chase Bank, N.A. ("Chase") for claims relating to Chase's allegedly improper charges for unpaid taxes and force-placed insurance and its attempts to collect those charges.  (First Amended Complaint ("FAC"), ECF No. 6.[1])  Chase moves to dismiss Plaintiffs' First Amended Complaint.  (Motion, ECF No. 16.)  All parties consent to the undersigned's jurisdiction.  (JPMorgan's Consent, ECF No. 10; Plaintiffs' Consent, ECF No. 12.)  The court grants in part and denies in part Chase's motion.  Plaintiffs may file any Second Amended Complaint by May 25, 2015.

### STATEMENT

Ms. Guccione and Ms. Salehi-Had, who is over the age of 65, are the owners of real property located at 300 Darrell Road, Hillsborough, California 94010 (the "Property").  (FAC ¶¶ 2, 9.)  On

---

[1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

UNITED STATES DISTRICT COURT
For the Northern District of California

March 29, 2006, they refinanced the Property through Washington Mutual Bank, F.A. ("Washington Mutual").  (*Id.* ¶ 9.)  In doing so, Plaintiffs executed a promissory note for $910,000 and secured it with the Property through a deed of trust.  (*Id.* ¶¶ 9, 50 & Ex. A (deed of trust).)  Chase subsequently acquired certain assets and assumed certain liabilities of Washington Mutual and became the servicer of Plaintiffs' loan.  (*Id.* ¶ 9.[2])

In September 2010, Plaintiffs submitted a loan modification application to Chase.  (*Id.* ¶ 10.)  Thereafter, in April 2011, Chase "created an escrow account and started to pay Plaintiffs' property taxes and insurance, even though Plaintiffs were already doing so."  (*Id.* ¶¶ 11, 12 & Ex. B.)  Before this time, "Chase did not request or collect monthly escrow payments[,] and all property taxes and insurance payment[s] were paid by Plaintiffs."  (*Id.* ¶ 12.)  Plaintiffs have never had a lapse in insurance coverage.  (*Id.* ¶ 14 & Exs. E, F.)

Nevertheless, Plaintiffs' April 2011 statement from Chase states that Plaintiffs owed $11,609.43 in escrow payments.  (*Id.* ¶ 12)  Plaintiffs' April 2011 statement thus states that Plaintiffs owe, in addition to their monthly principal and interest amount of $4,622.78, a monthly escrow charge of $1,277.45.  (*Id.* ¶ 12 & Ex. B.)  The statement states that this amount stems from tax and insurance payments occurring from October 2006 to May 2007.  (*Id.* ¶¶ 13, 14, 16 & Ex. B.)  But this does not make sense to Plaintiffs because these charges did not appear on Plaintiffs' December 2009 and October 2010 statements, which stated that Plaintiffs' escrow balance was $0.  (*Id.* ¶ 13 & Exs. C, D.)  According to Plaintiffs, this means that there could not have been an escrow balance "carried forward" from October 2006 to April 2011.  (*Id.* ¶ 13.)  In addition, the statement also projects an escrow balance shortfall of $15,329.23 in March 2012 and thus states that Plaintiffs also owe a monthly escrow deposit of $1,860.00 to cover future property taxes and insurance.  (*Id.* ¶ 12 & Ex. B.)

As for the insurance, Plaintiffs allege that Chase had no reason to pay $898.90 for it because they already had insurance.  (*Id.* ¶ 15.)  As for the property taxes, Plaintiffs allege that Chase,

---

[2] On September 25, 2008, the Office of Thrift Supervision closed Washington Mutual and appointed the FDIC as receiver.  (Chase's Request for Judicial Notice ("RJN"), Ex. 2, ECF No. 17.)  On the same date, JPMorgan entered into a purchase and assumption agreement with the FDIC by which JPMorgan acquired certain assets and assumed certain liabilities of Washington Mutual.  (*Id.*)

1   without first attempting to contact them and despite the fact that Plaintiffs had already timely paid

2   their taxes, paid $10,710.53 in taxes to San Mateo County in December 2010.  (*Id.* ¶ 16 & Ex. G.)

3   The next month, however, San Mateo County rejected this "duplicate payment" and refunded it to

4   Chase.  (*Id.* ¶ 16 & Ex. G.)  But Plaintiffs' January 2011 statement still stated that Plaintiffs owed

5   this amount as an escrow payment.  (*Id.* ¶ 16.)  Plaintiffs allege that this situation occurred again in

6   April 2011.  (*Id.* ¶ 17.)  Even though Plaintiffs timely paid their taxes on March 30, 2011, Chase

7   once again paid $10,710.53 in taxes to San Mateo County, and San Mateo County once again

8   rejected the "duplicate payment" and refunded it to Chase the next month.  (*Id.* ¶ 17 & Ex. H.)

9   Chase nevertheless continued to charge Plaintiffs a monthly escrow charge and a monthly escrow

10  deposit totaling $3,317.45 to cover the unnecessary insurance payments and the refunded tax

11  payments.  (*Id.* ¶ 18.)  This made Plaintiffs' monthly bills total $7,760.23, rather than $4,622.78

12  (principal and interest) as before.  (*Id.*)

13      To do something about this, Plaintiffs solicited the Gordon Law Firm about obtaining a loan

14  modification from Chase.  (*Id.* ¶ 19.)  The Gordon Law Firm told Plaintiffs to stop making their

15  mortgage payments so they would qualify for one.  (*Id.*)  Plaintiffs followed the Gordon Law Firm's

16  advice, and the Property subsequently went into foreclosure.  (*Id.*; *see* RJN, Exs. 3 (notice of

17  default), 4 (notice of trustee's sale).)  The Gordon Law Firm later was shut down by the Consumer

18  Finance Protection Bureau, which also sued the firm and its attorney, Chance Gordon, who was

19  disbarred.  (FAC ¶ 19 n.1.)

20      On November 21, 2011, Plaintiff, through counsel, sued Chase and the Gordon Law Firm in San

21  Mateo County Superior Court for claims related to Plaintiffs' attempts to seek a loan modification

22  and the foreclosure of the Property (the "State Court Action").  (RJN, Ex. 5 (original complaint in

23  the State Court Action).)  Plaintiffs brought the following 11 claims: (1) violation of California Civil

24  Code § 2923.5; (2) violation of California's Unfair Competition Law, California Civil Code § 17500

25  et seq.; (3) violation of California Civil Code § 2945 et seq.; (4) false advertising; (5) intentional

26  misrepresentation; (6) negligent misrepresentation; (7) breach of fiduciary duty; (8) negligence; (9)

27  to enjoin the trustee's sale; (10) negligence per se; and (11) violation of California Civil Code §

28  2924.  (RJN, Ex. 7 (second amended complaint in the State Court Action).)

"After filing the lawsuit, Plaintiffs wanted to reinstate their loan." (FAC ¶ 20.)  On January 6, 2012, Chase's counsel sent Plaintiffs a "reinstatement quote letter," which "incorrectly stated that Plaintiffs owed $61,464.00, when in fact Plaintiffs owed $28,984.00." (*Id.* ¶ 20 & Ex. I.)  On January 20, 2012, Plaintiffs' counsel informed Chase's counsel that the reinstatement amount quoted in the letter was incorrect. (*Id.* ¶ 21.)  On January 23, 2012, "it was explained in writing to Chase's counsel what was wrong with the payoff amount," and that same day Chase's counsel "stated she would get clarification from Chase." (*Id.* ¶ 22.)  Plaintiffs, however, never got clarification. (*Id.*)

On March 8, 2012, Ms. Guccione "served Chase [with a Qualified Written [Request]" that sought her payment history, the monthly statements sent to her, an escrow analysis, the current amount needed to pay off their loan in full, and Chase's relationship to her (e.g., servicer of her loan, etc.) (*Id.* ¶ 23.[3])  Separately, Plaintiffs' counsel also told Chase's counsel that "if we can determine the reinstatement amount, [Plaintiffs] can and will pay.  It is unfortunate that we cannot get this, but maybe the letter will get it to us quicker." (*Id.*)

The problems did not end.  In March 2012, Plaintiffs "went to the San Mateo County Office and paid their property tax payment on March 7, 2012." (*Id.* ¶ 24.)  This payment was later refunded because "Chase paid the payment hours before" Plaintiffs did. (*Id.*)  Chase did this before the payment was due. (*Id.*)

On May 10, 2012, Chase sent Plaintiffs a "payoff quote letter demanding $989,061.52 to [pay off] Plaintiffs' loan." (*Id.* ¶ 25.[4])  "In its calculations, Chase demanded that Plaintiffs pay several thousand[ dollars] in additional unsubstantiated escrow fees to reinstate their loan." (*Id.*)

On May 11, 2012, in response to Plaintiffs' request for a reinstatement quote, Chase sent Plaintiffs a "payoff quote letter" stating that as of May 15, 2012, Plaintiffs could reinstate their loan

---

[3] Plaintiffs allege that they served Chase with a "Qualified Written Response," but the document actually states that it is a "Qualified Written Request." (*Compare* FAC ¶ 23 *with id.*, Ex. J.)

[4] To support this allegation, Plaintiffs cite to Exhibit K to their First Amended Complaint. Exhibit K, however, does not support this statement, as it appears to be the same document as Exhibit L, which is a letter dated May 11, 2012 and which states that as of May 15, 2012, Plaintiffs' could reinstate their loan for $92,315.30; it says nothing about how much it would cost for Plaintiffs to "pay off" their loan.

for $92,315.30.  (*Id.* ¶ 26 & Ex. L.)  "In its calculations, Chase demanded that Plaintiffs pay several thousand[ dollars] in additional unsubstantiated escrow fees to reinstate their loan."  (*Id.* ¶ 26.) "This letter demanded," "in addition to the regular monthly payment of $4,622.78," "an escrow payment of $3,137.45 and a $898.50 payment without specifying what the payments [were] for." (*Id.*)  Plaintiffs allege that they actually owed only $67,540.00.  (*Id.*)

Over the next several months, Plaintiffs wrote to Chase several times to inquire about the unsubstantiated escrow fees and to provide documentation refuting those fees.  (*Id.* ¶ 27.)

On April 2013, Plaintiffs received a "payoff quote" dated April 19, 2013 which states that Plaintiffs owed $40,005.95 for escrow advances.  (*Id.* ¶ 28 & Ex. M.)  But they also received a "reinstatement quote," which was dated April 19, 2013 as well, stating that they owed $0.00 for escrow advances.  (*Id.* ¶ 28 & Ex. N.)  If that was not odd enough, Plaintiffs received another "payoff quote," this one dated April 25, 2013, which states that they owed $28,714.90 for escrow advances.  (*Id.* ¶ 28 & Ex. O.)

Plaintiffs thereafter received a notice dated July 9, 2013, thanking Plaintiffs for providing proof of insurance and stating that the insurance coverage Chase had purchased on their behalf had been cancelled effective August 4, 2012.  (*Id.* ¶ 29 & Ex. P.)  It also states that "[t]he premium charged has been refunded to your account."  (*Id.*, Ex. P.)  Plaintiffs allege that this letter was sent nearly one year after Chase claimed that it was not longer paying for insurance on Plaintiffs' behalf and that Chase continues to pay for insurance on their behalf "to this day."  (*Id.* ¶ 29.)

Then, when Plaintiffs tried to timely pay their property taxes in August 2013, they discovered that Chase already had paid the taxes for them and that Chase did this six weeks before the taxes were due.  (*Id.* ¶ 30.)

On January 16, 2014, Plaintiffs' counsel sent Chase a "notice of error" pursuant to 12 C.F.R. § 1024.35(b)(5), a regulation promulgated pursuant to the Real Estate Settlement Procedures Act.  (*Id.* ¶ 31 & Ex. Q.)  In it, Plaintiffs's counsel states that Plaintiffs believe Chase incorrectly assessed charges totaling $97,260.95 to their escrow account, that they actually owe only $22,360.00, and that Plaintiffs request that Chase credit $3,377.22 to their account for an advance payment they made but which was never credited.  (*Id.* ¶ 31 & Ex. Q.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1       Chase's counsel responded to the January 16, 2014 notice of error on March 3, 2014 by stating

2   that "Chase has conducted a thorough investigation into the foregoing claimed 'errors' and has

3   concluded that all account information is correct and no error has occurred." (*Id.* ¶ 32 & Ex. R.)  As

4   for the alleged escrow account errors, Chase's counsel stated that "Plaintiff[s have] been

5   inconsistent in making insurance and property tax payments on the Property, which has resulted in

6   Chase having to make payments on Plaintiff[s'] behalf." (*Id.* ¶ 32 & Ex. R.)  Chase's counsel stated

7   that $75,554.70 in escrow charges had accrued from April 2011 through February 2014. (*Id.* ¶ 33 &

8   Ex. R.)  Chase's counsel then stated that this amount did not include the actual charges for insurance

9   for property taxes that Chase paid on Plaintiffs' behalf. (*Id.* ¶ 34 & Ex. R.)  Those actual charges

10  totaled $23,939.90, which was composed of an October 13, 2010 payment of $898.90 for insurance,

11  a November 11, 2011 payment of $10,893.50 for property taxes, a March 7, 2012 payment of

12  $10,893.50 for property taxes, and an August 6, 2013 payment of $1,254.00 for insurance. (*Id.* ¶ 34

13  & Ex. R.)  Plaintiffs say that Chase's counsel still did "not explain what accrued escrow charges are

14  or why Plaintiffs need to pay them, and when Plaintiffs' counsel requested clarification from

15  Chase's counsel, none was given." (*Id.* ¶ 35.)

16      On April 23, 2014, Plaintiffs' counsel sent Chase a second "notice of error" pursuant to 12

17  C.F.R. § 1024.35(b)(5). (*Id.* ¶ 36 & Ex. S.)  In it, Plaintiffs' counsel states that Chase erroneously

18  force-placed insurance and that Plaintiffs contest $77,707.60 in "charges associated with Chase's

19  force-placed insurance policy and taxes." (*Id.* ¶ 36 & Ex. S.)  Plaintiffs requested that Chase fix the

20  errors. (*Id.* ¶ 36 & Ex. S.)

21      On June 5, 2014, Chase's counsel responded by stating that Chase force-placed the insurance

22  because Plaintiffs failed to provide proof of insurance and that once Plaintiffs did so, Chase

23  cancelled it. (*Id.* ¶ 37 & Ex. T.)  To support this statement, Chase's counsel attached a document

24  detailing insurance purchases from November 2008 through December 2010. (*Id.* ¶ 37 & Ex. T.)

25  But Plaintiffs say that this document relates to property that is located in Utah, not California, and

26  which is serviced by CitiMortgage (the logo is on the document), not Chase. (*Id.* ¶ 38.)  Plaintiffs

27  further say that Chase's statement is belied by the fact that Chase is still force-placing insurance, as

28  Plaintiffs' August 2014 insurance payment was refunded by their insurance company because it has

1   already been paid.  (*Id.* ¶ 38 & Ex. U.)

2       On October 1, 2014, Plaintiffs filed this action against Chase.  (Original Complaint, ECF No. 1.)

3   They bring the following seven claims: (1) declaratory relief; (2) breach of contract; (3) violation of

4   the Real Estate Settlement Procedures Act ("RESPA"); (4) violation of the Rosenthal Fair Debt

5   Collection Practices Act ("RFDCPA"); (5) violation of California's Unfair Competition Law

6   ("UCL"), California Civil Code § 17200 et seq.; (6) financial elder abuse in violation of California

7   Welfare and Institutions Code § 15610.30; and (7) intentional infliction of emotional distress.  (FAC

8   ¶¶ 45-84.)

9       Plaintiffs voluntarily dismissed the State Court Action without prejudice on December 11, 2014.

10  (RJN, Ex. 9.)

11      Chase now moves to dismiss Plaintiffs' First Amended Complaint.  (Motion, ECF No. 16; *see*

12  *also* Reply, ECF No. 23.)  Plaintiffs oppose the motion.  (Opposition, ECF No. 22.)  On April 14,

13  2015, the court found this matter suitable for determination without oral argument and vacated the

14  April 16, 2015 hearing.  (4/14/2015 Clerk's Notice, ECF No. 24.)

**ANALYSIS**

16  **I.  LEGAL STANDARD**

17      Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain

18  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

19  complaint must therefore provide a defendant with "fair notice" of the claims against it and the

20  grounds for relief.  *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quotation and

21  citation omitted).

22      A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does

23  not contain enough facts to state a claim to relief that is plausible on its face.  *See Twombly*, 550

24  U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

25  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

26  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a

27  'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

28  unlawfully."  *Id*. (quoting *Twombly*, 550 U.S. at 557.).  "While a complaint attacked by a Rule

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County,* 487 F.3d 1246, 1249 (9th Cir. 2007).

If the court dismisses the complaint, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990)). But when a party repeatedly fails to cure deficiencies, the court may order dismissal without leave to amend. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (affirming dismissal with prejudice where district court had instructed *pro se* plaintiff regarding deficiencies in prior order dismissing claim with leave to amend).

## II. APPLICATION

### A. California's Litigation Privilege Does Not Apply Here

Chase first argues that five of Plaintiffs' seven claims—for declaratory relief, breach of contract, violation of California's Unfair Competition Law, financial elder abuse, and intentional infliction of emotional distress—are barred by California's so-called "litigation privilege." This privilege, which is codified at California Civil Code § 47(b), provides that "[a] privileged publication or broadcast is one made . . . [i]n any . . . judicial proceeding . . . ."[5]  "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal.3d 205, 212 (Cal.

---

[5] The privileges codified at California Civil Code § 47(b) are subject to certain exceptions, none of which is applicable here. *See* Cal. Civ. Code § 47(b)(1)-(4).

1    1990).  The privilege is "absolute and applies regardless of malice."  *Jacob B. v. County of Shasta*,

2    40 Cal. 4th 948, 955-56 (Cal. 2007) (citations omitted).

3        "The privilege 'applies to any publication required or permitted by law in the course of a judicial

4    proceeding to achieve the objects of the litigation, even [if] the publication is made outside the

5    courtroom and no function of the court or its officers is involved.'"  *Jacob B.*, 40 Cal. 4th at 955

6    (quoting *Silberg*, 50 Cal.3d at 212).  Accordingly, "[n]umerous courts have held that statements

7    relating to settlements also fall within the privilege, including those made during settlement

8    negotiations."  *Navarro v. IHOP Properties, Inc.*, 134 Cal. App. 4th 834, 843-44 (Cal. Ct. App.

9    2005) (citations omitted).  Moreover, "[t]he privilege 'is not limited to statements made during a

10   trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.'"  *Action*

11   *Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1241 (Cal. 2007) (quoting *Rusheen*

12   *v. Cohen*, 37 Cal.4th 1048, 1057 (Cal. 2006)).

13       The California Supreme Court has explained that the purposes of the litigation privilege are to

14   afford litigants and witnesses free access to the courts without fear of being harassed subsequently

15   by derivative tort actions, encourage open channels of communication and zealous advocacy,

16   promote complete and truthful testimony and effective judicial proceedings, give finality to

17   judgments, and avoid unending litigation.  *Jacob B.*, 40 Cal. 4th at 955 (citing *Flatley v. Mauro*, 39

18   Cal. 4th 299, 322 (Cal. 2006); *Rusheen*, 37 Cal.4th at 1063).  To further these purposes, the privilege

19   has been broadly applied.  *Action Apartment Ass'n*, 41 Cal. 4th at 1241; *Jacob B.*, 40 Cal. 4th at 955-

20   56.  Although "[t]he litigation privilege 'derives from common law principles establishing a defense

21   to the tort of defamation,'"  *Action Apartment Ass'n*, 41 Cal. 4th at 1241 (quoting *Oren Royal Oaks*

22   *Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal.3d 1157, 1163 (Cal. 1986), and "[i]ts

23   placement in the Civil Code immediately following the statutory provisions defining the elements of

24   the twin defamation torts of libel and slander . . . makes clear that, at least historically, the section

25   was primarily designed to limit an individual's potential liability for defamation," *Oren Royal Oaks*

26   *Venture*, 42 Cal.3d at 1163, it has been extended to apply to torts other than defamation.  *Action*

27   *Apartment Ass'n*, 41 Cal. 4th at 1241-42.  It has "been held to immunize defendants from tort

28   liability based on theories of abuse of process, intentional infliction of emotional distress, intentional

UNITED STATES DISTRICT COURT
For the Northern District of California

1  inducement of breach of contract, intentional interference with prospective economic advantage,

2  negligent misrepresentation, invasion of privacy, negligence and fraud." *Silberg*, 50 Cal.3d at 215

3  (internal citations omitted); *see also Rubin v. Green*, 4 Cal. 4th 1187, 1204 (Cal. 1993) (litigation

4  privilege barred a claim for violation of California's Unfair Competition Law).  It does not apply,

5  however, to actions for malicious prosecution. *Action Apartment Ass'n*, 41 Cal. 4th at 1242 (citing

6  *Albertson v. Raboff*, 46 Cal. 2d 375, 382 (Cal. 1956)).

7      In deciding whether to apply the litigation privilege, courts must "draw[] a 'a careful distinction

8  between a cause of action based squarely on a privileged communication, such as an action for

9  defamation, and one based upon an underlying course of conduct evidenced by the

10  communication.'" *Id.* at 128-49 (quoting *White v. Western Title Ins. Co.*, 40 Cal.3d 870, 888 (Cal.

11  1985)).  As such, the California Supreme Court has held that the litigation privilege does not bar a

12  plaintiff's claim where the plaintiff was injured not from the a privileged communication itself but

13  rather was injured as a result of other conduct, of which the privileged communication is merely

14  evidence. *See Kimmel v. Goland*, 51 Cal. 3d 202, 209-12 (Cal. 1990) (holding that the defendants'

15  cross-complaint for damages for violation of California Penal Code § 632 was not barred by the

16  litigation privilege because the defendants alleged that they were injured "from the taping of

17  confidential telephone conversations, not from any 'publication' or 'broadcast' of the information

18  contained in th[o]se conversations" and thus the litigation privilege was "plainly non applicable");

19  *Westlake Cmty. Hosp. v. Superior Court*, 17 Cal. 3d 465, 482 (Cal. 1976) (rejecting the defendants'

20  argument that the litigation privilege barred the plaintiff's claims for intentional and unlawful

21  interference with the right to pursue and practice a lawful calling and trade, conspiracy to restrain

22  competition, intentional infliction of emotional distress, and fraud and deceit, because "the gist of

23  her claim[s] is not that her injury has been occasioned simply by defendants' malicious *statements* at

24  [quasi-judicial revocation] proceedings, but rather that she has been injured by the malicious *actions*

25  of the hospital and its committee members in revoking her staff privileges") (italics in original); *see*

26  *also Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1132 n. 12 (Cal. 1990) ("The

27  [litigation] privilege does not apply to bar liability here, as the Court of Appeal correctly determined,

28  because the gravamen of the complaint was not a communication but a course of conduct.")

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Following that authority, federal district courts sitting in California have held the same.  *See*

2  *American Gen. Life Ins. Co. v. James*, No. C-14-0442 DMR, 2015 WL 730010, at *4-5 (N.D. Cal.

3  Feb. 19, 2015) (refusing to apply the litigation privilege to bar the defendants' counterclaim for

4  breach of the duty of good faith and fair dealing where the settlement communications were

5  evidence of a course of conduct, not the underlying basis of the claim); *Competitive Techs. v. Fujitsu*

6  *Ltd.*, 286 F. Supp. 2d 1118, 1153-54 (N.D. Cal. 2003) (Spero, J.) (declining to apply the litigation

7  privilege and dismiss the defendants' unfair competition counterclaims because the defendants

8  alleged that they were injured as a result of having to defend against a baseless proceeding before

9  the International Trade Commission and thus "the alleged misrepresentations [by the plaintiffs to the

10  International Trade Commission were] offered as evidence of the underlying course of conduct

11  rather than as the actual source of the harm"); *Microsoft Corp. v. A–Tech Corp.*, 855 F. Supp. 308,

12  314 (C.D. Cal. 1994) (Lew, J.) (concluding that the litigation privilege did not bar the defendants'

13  abuse of process counterclaim because it was "not derived from [the plaintiff's] ex parte asset freeze

14  application submitted to the court"; instead, the counterclaim "derived strictly from the alleged

15  misuse or misapplication of judicial process, otherwise justified in itself, for an end other than that

16  which it was designed to accomplish").

17    In this case, Chase argues that the litigation privilege bars Plaintiffs' claims because those claims

18  "are premised on communications between Plaintiffs' counsel and Chase's counsel that took place

19  during the course of the State Court Action (from November 2011 through the filing of the instant

20  lawsuit in October 2014) and on documents provided by Chase's counsel to Plaintiffs during that

21  time."  (Motion, ECF No. 16 at 13.)  This is not correct.  Plaintiffs' claims are not "premised on"

22  those communications and documents.  Plaintiffs' claims are based on Chase's allegedly improper

23  charges for unpaid taxes and force-placed insurance and its attempts to collect those charges.

24  Plaintiffs' problems with Chase started before they filed the State Court Action and before their

25  counsel began communicating with Chase's counsel.  Chase's counsel's communications merely

26  show that, despite Plaintiffs' requests that the charges be adequately explained or removed, Chase

27  has not done so.  Thus, the court concludes that the litigation does not bar any of Plaintiffs' claims in

28  this action.

## B. Breach of Contract

Plaintiffs' second claim is for breach of contract.  (FAC ¶¶ 49-53.)  To state a claim for breach of contract in California, a plaintiff must allege the following elements: (1) existence of a contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; and (4) resulting damage.  *See Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  "Facts alleging a breach, like all essential elements of a breach of contract cause of action, must be pleaded with specificity."  *See Levy v. State Farm Mut. Auto. Ins. Co.*, 150 Cal. App. 4th 1, 5 (2007).

Chase argues that Plaintiffs do not sufficiently allege the existence of a contract.  The court agrees.  Plaintiffs allege that "[t]he promissory note constitutes an agreement between the parties regarding the escrow account."  (FAC ¶ 50.)  Yet, as Chase points out, the promissory note is not in the record and Plaintiffs do not allege any of the promissory note's terms, without which the court cannot determine whether Plaintiffs performed their obligations and whether Chase breached its obligations.

In their opposition, Plaintiffs say that the promissory note is evidenced by the deed of trust, which is in the record, and they argue that Chase breached at least two sections of it.  (Opposition, ECF No. 22 at 10.)  It is true that the pairing of a promissory note and a deed of trust can constitute a contract, *see, e.g.*, *Steiner v. OneWest Bank FSB*, No: C 13-05349 SBA, 2014 WL 2452212, at *4-5 (N.D. Cal. May 30, 2014) (concluding that, under Arizona law, the plaintiffs' breach of contract claim, which was based on "a written agreement in the form of a Promissory Note (i.e., the Balloon Note), an addendum to the Balloon Note, and a Deed of Trust," was alleged sufficiently to withstand a motion to dismiss), and that a deed of trust can, too, even on its own, *see, e.g.*, *Harris v. Wells Fargo Bank, N.A.*, No. 12-cv-05629-JST, 2013 WL 1820003, at *8 (N.D. Cal. Apr. 30, 2013) (citing *Hatch v. Collins*, 225 Cal. App. 3d 1104, 1111 (Cal. Ct. App. 1990)).  The problem here, though, is that Plaintiffs do not allege any of the deed of trust's terms.  (*See* FAC ¶¶ 49-53.)  And without doing so, Plaintiffs' breach of contract claim fails and is dismissed without prejudice.  *See, e.g.*, *Kroetch v. BAC Home Loan Servs.*, No. C 11-2860 MEJ, 2011 WL 4502350, at *3 (N.D. Cal. Sept. 27, 2011) (dismissing Plaintiff's breach of contract claim, which was based on a promissory note and a deed of trust, where "Plaintiff has not identified any specific contractual provision allegedly

breached by Defendant in support of his breach of contract claim"); *Kaui Scuba Ctr., Inc. v. Padi Americas, Inc.*, No. SACV 10-1579 DOC (MANx), 2011 WL 2711177, at *5 (C.D. Cal. July 13, 2011) (dismissing Plaintiff's breach of contract claim "because Plaintiff failed to plead the existence of the contract by its terms or legal effect" where Plaintiff did not "attach a copy of the contract establishing the contractual terms, and/or lay out the specific terms of the contract in the complaint").[6]

### C. RESPA

Plaintiffs' third claim is for violation of RESPA.  (FAC ¶¶ 54-61.)  RESPA was enacted, in part, to ensure "that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). It provides that borrowers may inquire about federally related mortgages by making a "qualified written request." 12 U.S.C. § 2605(e)(1)(A). A qualified written request must describe why a borrower believes her account is in error or provide sufficient detail to the servicer regarding other information sought by the borrower.  12 U.S.C. § 2605(e)(1)(B). RESPA provides plaintiffs with a private right of action for, among other wrongful acts, a loan servicer's failure to respond to a qualified written request for information about a loan.  12 U.S.C. § 2605(f); *see Choudhuri v. Wells Fargo Bank, N.A.,* No. C 11-00518 SBA, 2011 WL 5079480, at *8 (N.D. Cal. Oct. 25, 2011) (citing *Patague v. Wells Fargo Bank, N.A.,* No. C 10-03460 SBA, 2010 WL 4695480, at *3 (N.D. Cal. Nov. 8, 2010)).

On January 10, 2014, new regulations went into effect through the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010.  Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd–Frank Act").  The regulations, which were promulgated pursuant to RESPA, are known as

---

[6] Chase makes two other arguments.  It argues that (1) it did not breach the provisions of the deed of trust that Plaintiffs mention in their opposition, and (2) Plaintiffs' allegations regarding their when they stopped making their monthly mortgage payments show that they cannot allege that they performed their obligations under the alleged contract.  (Motion, ECF No. 16 at 16; Reply, ECF No. 23 at 9-10.)  The court does not address these arguments in light of Plaintiffs' failure to allege the existence of a contract or the terms of it, and the lack of full briefing on them.  If and when Plaintiffs do, Chase may make these arguments again.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    "Regulation X," and are codified at 12 C.F.R. § 1024, increase a loan servicer's obligations to

2    respond to a qualified written request. For example, section 1024.35, which is the regulation at issue

3    here, requires a loan servicer to respond to a "notice of error" is specific ways. In light of the

4    newness of this regulation and the relative lack of authority interpreting it, the court quotes it in full

5    below:

> (a) Notice of error. A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred. A notice on a payment coupon or other payment form supplied by the servicer need not be treated by the servicer as a notice of error. A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request.

> (b) Scope of error resolution. For purposes of this section, the term "error" refers to the following categories of covered errors:

> (1) Failure to accept a payment that conforms to the servicer's written requirements for the borrower to follow in making payments.

> (2) Failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law.

> (3) Failure to credit a payment to a borrower's mortgage loan account as of the date of receipt in violation of 12 CFR 1026.36(c)(1).

> (4) Failure to pay taxes, insurance premiums, or other charges, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay, in a timely manner as required by § 1024.34(a), or to refund an escrow account balance as required by § 1024.34(b).

> (5) Imposition of a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower.

> (6) Failure to provide an accurate payoff balance amount upon a borrower's request in violation of section 12 CFR 1026.36(c)(3).

> (7) Failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by § 1024.39.

> (8) Failure to transfer accurately and timely information relating to the servicing of a borrower's mortgage loan account to a transferee servicer.

> (9) Making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process in violation of § 1024.41(f) or (j).

> (10) Moving for foreclosure judgment or order of sale, or conducting a foreclosure sale in violation of § 1024.41(g) or (j).

> (11) Any other error relating to the servicing of a borrower's mortgage loan.

UNITED STATES DISTRICT COURT
For the Northern District of California

(c) Contact information for borrowers to assert errors. A servicer may, by written notice provided to a borrower, establish an address that a borrower must use to submit a notice of error in accordance with the procedures in this section. The notice shall include a statement that the borrower must use the established address to assert an error. If a servicer designates a specific address for receiving notices of error, the servicer shall designate the same address for receiving information requests pursuant to § 1024.36(b). A servicer shall provide a written notice to a borrower before any change in the address used for receiving a notice of error. A servicer that designates an address for receipt of notices of error must post the designated address on any Web site maintained by the servicer if the Web site lists any contact address for the servicer.

(d) Acknowledgment of receipt. Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving a notice of error from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the notice of error.

(e) Response to notice of error.

   (1) Investigation and response requirements.

      (I) In general. Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:

         (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

         (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

      (ii) Different or additional error. If during a reasonable investigation of a notice of error, a servicer concludes that errors occurred other than, or in addition to, the error or errors alleged by the borrower, the servicer shall correct all such additional errors and provide the borrower with a written notification that describes the errors the servicer identified, the action taken to correct the errors, the effective date of the correction, and contact information, including a telephone number, for further assistance.

   (2) Requesting information from borrower. A servicer may request supporting documentation from a borrower in connection with the investigation of an asserted error, but may not:

      (I) Require a borrower to provide such information as a condition of investigating an asserted error; or

      (ii) Determine that no error occurred because the borrower failed to provide any requested information without conducting a reasonable investigation pursuant to paragraph (e)(1)(i)(B) of this section.

UNITED STATES DISTRICT COURT
For the Northern District of California

(3) Time limits.

(i) In general. A servicer must comply with the requirements of paragraph (e)(1) of this section:

(A) Not later than seven days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error for errors asserted under paragraph (b)(6) of this section.

(B) Prior to the date of a foreclosure sale or within 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error, whichever is earlier, for errors asserted under paragraphs (b)(9) and (10) of this section.

(C) For all other asserted errors, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error.

(ii) Extension of time limit. For asserted errors governed by the time limit set forth in paragraph (e)(3)(i)(c) of this section, a servicer may extend the time period for responding by an additional 15 days (excluding legal public holidays, Saturdays, and Sundays) if, before the end of the 30–day period, the servicer notifies the borrower of the extension and the reasons for the extension in writing. A servicer may not extend the time period for responding to errors asserted under paragraph (b)(6), (9), or (10) of this section.

(4) Copies of documentation. A servicer shall provide to the borrower, at no charge, copies of documents and information relied upon by the servicer in making its determination that no error occurred within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receiving the borrower's request for such documents. A servicer is not required to provide documents relied upon that constitute confidential, proprietary or privileged information. If a servicer withholds documents relied upon because it has determined that such documents constitute confidential, proprietary or privileged information, the servicer must notify the borrower of its determination in writing within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receipt of the borrower's request for such documents.

(f) Alternative compliance.

(1) Early correction. A servicer is not required to comply with paragraphs (d) and (e) of this section if the servicer corrects the error or errors asserted by the borrower and notifies the borrower of that correction in writing within five days (excluding legal public holidays, Saturdays, and Sundays) of receiving the notice of error.

(2) Error asserted before foreclosure sale. A servicer is not required to comply with the requirements of paragraphs (d) and (e) of this section for errors asserted under paragraph (b)(9) or (10) of this section if the servicer receives the applicable notice of an error seven or fewer days before a foreclosure sale. For any such notice of error, a servicer shall make a good faith attempt to respond to the borrower, orally or in writing, and either correct the error or state the reason the servicer has determined that no error has occurred.

(g) Requirements not applicable.

(1) In general. A servicer is not required to comply with the requirements of paragraphs (d), (e), and (i) of this section if the servicer reasonably determines that any of the following apply:

(i) Duplicative notice of error. The asserted error is substantially the same as an error previously asserted by the borrower for which the servicer has previously complied with its obligation to respond pursuant to paragraphs (d) and (e) of this section, unless the borrower provides new and material information to support the asserted error. New and material information means information that was not reviewed by the servicer in connection with investigating a prior notice of the same error and is reasonably likely to change the servicer's prior determination about the error.

(ii) Overbroad notice of error. The notice of error is overbroad. A notice of error is overbroad if the servicer cannot reasonably determine from the notice of error the specific error that the borrower asserts has occurred on a borrower's account. To the extent a servicer can reasonably identify a valid assertion of an error in a notice of error that is otherwise overbroad, the servicer shall comply with the requirements of paragraphs (d), (e) and (i) of this section with respect to that asserted error.

(iii) Untimely notice of error. A notice of error is delivered to the servicer more than one year after:

(A) Servicing for the mortgage loan that is the subject of the asserted error was transferred from the servicer receiving the notice of error to a transferee servicer; or

(B) The mortgage loan is discharged.

(2) Notice to borrower. If a servicer determines that, pursuant to this paragraph (g), the servicer is not required to comply with the requirements of paragraphs (d), (e), and (i) of this section, the servicer shall notify the borrower of its determination in writing not later than five days (excluding legal public holidays, Saturdays, and Sundays) after making such determination. The notice to the borrower shall set forth the basis under paragraph (g)(1) of this section upon which the servicer has made such determination.

(h) Payment requirements prohibited. A servicer shall not charge a fee, or require a borrower to make any payment that may be owed on a borrower's account, as a condition of responding to a notice of error.

(i) Effect on servicer remedies.

(1) Adverse information. After receipt of a notice of error, a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error.

(2) Remedies permitted. Except as set forth in this section with respect to an assertion of error under paragraph (b)(9) or (10) of this section, nothing in this section shall limit or restrict a lender or servicer from pursuing any remedy it has under applicable law, including initiating foreclosure or proceeding with a foreclosure sale.

12 C.F.R. § 1024.35.

UNITED STATES DISTRICT COURT
For the Northern District of California

1     12 C.F.R. § 1024.35 is enforceable under 12 U.S.C. § 2605(f), *see* 12 C.F.R. § 1023.41, and

2     here, Plaintiffs allege that Chase violated section 1024.35(e).  They allege that they informed Chase

3     in their January 16, 2014 and April 23, 2014 notices of error that Chase overcharged them by

4     $74,846.95 and unnecessarily force-placed insurance for their property but Chase neither corrected

5     these errors nor conducted a reasonable investigation into them.  (FAC ¶¶ 58-59.)  They further

6     allege that "[i]t is obvious that Chase failed to fix the errors, or conduct a reasonable investigation

7     regarding the errors" because "[i]f Chase had done so, [it] would have corrected the escrow

8     overcharge of $74,846.95 and refunded the insurance charges for the amount of $2,152.90, and

9     discontinued force[-]place[d] insurance."  (*Id.* ¶ 60.)  "Chase [also] would not have provided

10    Plaintiffs with mortgage statements for a property in Utah, [for] which [Chase does] not even service

11    [the loan]."  (*Id.*)

12         Chase makes a few arguments.  First, it argues that Plaintiffs' January 16, 2014 notice was

13    "overbroad" and that it could "not reasonably determine from the notice of error the specific error

14    that the borrower asserts has occurred on a borrower's account," such that section 1024.35(g)

15    relieved it of its duty to comply with section 1024.35(e).  (Motion, ECF No. 16 at 17-18.)  The court

16    disagrees.  The notice states that Plaintiffs believe Chase incorrectly assessed charges totaling

17    $97,260.95 to their escrow account.  (FAC ¶ 31 & Ex. Q.)  It further states that Plaintiffs believe

18    they actually owe only $22,360.00.  (*Id.* ¶ 31 & Ex. Q.)  It also requests that Chase credit $3,377.22

19    to Plaintiffs' account for an advance payment they made but which was never credited.  (*Id.* ¶ 31 &

20    Ex. Q.)  Chase argues that Plaintiffs did not identify any specific error and instead "merely

21    complained" that they were being overcharged, but being overcharged is one of the errors that the

22    regulation says a borrower may identify.  *See* 12 C.F.R. 1024.35(b)(3) (failure to credit a payment to

23    a borrower's mortgage loan account as of the date of receipt"); *see also* 12 C.F.R. § 1024.35(b)(5)

24    (imposition of a fee or charge that the servicer lacks a reasonable basis to impose upon the

25    borrower).  Chase also says that Plaintiffs did not provide any factual support for these assertions,

26    but section 1024.35 does not require Plaintiffs to do that; it only requires them to identify the errors.

27    *See* 12 C.F.R. § 1024.35(a), (b).  Requiring Plaintiffs to provide all of the documentation regarding

28    the errors impermissibly shifts the burden to conduct a reasonable investigation from the servicers

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  (where the regulation puts it) to the borrower.

2      Second, Chase argues that even if Plaintiffs' January 16, 2014 notice was not overbroad, its

3  March 3, 2014 letter in response shows that it conducted a reasonable investigation.  (Motion, ECF

4  No. 16 at 18.)  The court disagrees with this argument, too.  In its response, while Chase reiterated

5  the escrow charges that it charged Plaintiffs and said that the charges had been accrued from April

6  2011 through February 2014, as Plaintiffs allege, it never explained why the charges were valid.  (*Id.*

7  ¶¶ 32-35 & Ex. R.)  And even if Chase provided Plaintiffs with the total escrow charges, this does

8  not necessarily prove the matter, especially in light of Chase sending Plaintiffs three different

9  documents in April 2013, each of which stated a different escrow amount owed.  (*See id.* ¶ 28 & Ex.

10  M (Plaintiffs owed $40,005.95 for escrow advances); *id.* ¶ 28 & Ex. N (Plaintiffs owed $0.00 for

11  escrow advances); *id.* ¶ 28 & Ex. O (Plaintiffs owed $28,714.90 for escrow advances).)  At least one

12  court has found contradictory explanations sufficient to allege a violation of section

13  1024.35(e)(1)(i)(B).  *See Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 805 (E.D. Pa. 2014)

14  (concluding that the plaintiff sufficiently alleged that the loan servicer did not conduct a reasonable

15  investigation of her notices, which stated that she was not given a permanent loan modification as

16  promised, where the loan servicer sent her responses with contradictory explanations for why her

17  loan could not be modified).

18      Third, Chase argues that its June 5, 2014 letter shows that it conducted a reasonable investigation

19  in response to Plaintiffs' April 23, 2014 notice.  (Motion, ECF No. 16 at 18-19.)  That letter stated

20  that Chase force-placed the insurance because Plaintiffs failed to provide proof of insurance and that

21  once Plaintiffs did so, Chase cancelled it.  (*Id.* ¶ 37 & Ex. T.)  But Plaintiffs allege that Chase is still

22  force-placing insurance, as Plaintiffs' August 2014 insurance payment was refunded by their

23  insurance company because it has already been paid.  (*Id.* ¶ 38 & Ex. U.)  They also point out that, to

24  support its explanation, Chase attached a document detailing insurance purchases from November

25  2008 through December 2010 in relation to property in Utah, not California, and which is serviced

26  by CitiMortgage, not Chase.  (*Id.* ¶ 37 & Ex. T.)  In short, Chase's explanation does not appear to be

27  supported, and this suggests that its investigation was not a reasonable one.  *See Wilson*, 48 F. Supp.

28  3d at 804 ("The addition of the word 'reasonable' seemingly imposes a substantive obligation that is

1    not satisfied by the mere procedural completion of some investigation following by a written

2    statement of reasons."); *Friedman v. Maspeth Fed. Loan and Sav. Ass'n*, 30 F. Supp. 3d 183, 194

3    (E.D.N.Y. 2014) (concluding that the plaintiff sufficiently alleged a violation of section

4    1024.35(e)(1)(i)(B) where the loan servicer's explanation was belied by the plaintiff's allegations

5    and evidence).

6        Finally, Chase argues that Plaintiffs have not alleged that they were damaged by its alleged

7    violation of section 1024.35(e).  (Motion, ECF No. 16 at 19.)  A lender or loan servicer who fails to

8    comply with § 2605 may be liable for "any actual damages to the borrower as a result of the failure."

9    § 2605(f)(1)(A).  Plaintiffs allege that Chase's "failure to correct errors and conduct a reasonable

10   investigation of the errors subjects it to statutory damages and reasonable attorney's fees."  (FAC ¶

11   61.)  The court notes that Plaintiffs also allege Chase is still force-placing insurance, as Plaintiffs'

12   August 2014 insurance payment was refunded by their insurance company because it has already

13   been paid.  (*Id.* ¶ 38 & Ex. U.)  Viewed as whole, the court believes that these allegations are

14   sufficient.  While Plaintiffs' alleged damages stem from Chase errors, they also implicate Chase's

15   failure to comply with RESPA.  Plaintiffs' allegations support the theory that had Chase actually

16   conducted a reasonable investigation, it would have realized that it was overcharging Plaintiffs'

17   escrow account and was unnecessarily force-placing insurance on their property, it would have

18   stopped, and Plaintiffs' saga would be resolved.  Chase did not conduct a reasonable investigation

19   (so Plaintiffs allege), and thus they must continue paying their attorney fees to try and resolve the

20   problems and continue dealing with this headache.

21       For the reasons explained above, the court finds that Plaintiffs sufficiently allege a claim against

22   Chase for violating 12 C.F.R. § 1024.35(e)(1)(i)(B).

23   **D. RFDCPA**

24       Plaintiffs' fourth claim is for violation of California's Rosenthal Fair Debt Collection Practices

25   Act.  (FAC ¶¶ 62-65.)  The RFDCPA "regulates the collection of 'consumer debts,' which are

26   defined as transactions by which 'property, services or money is acquired on credit . . . primarily for

27   personal, family, or household purposes."  *Quinlan v. Citimortgage, Inc.*, No. 2:11-cv-00986-

28   MCEEFB, 2011 WL 5299311, at *2 (E.D. Cal. Nov.2, 2011).  It is intended to "to prohibit debt

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts and to require debtors to act fairly in entering into and honoring such debts." Cal. Civ. Code § 1788.1. While providing its own standards governing debt-collection practices, the RFDCPA also provides, with limited exceptions, that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of" the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq. See* Cal. Civ. Code § 1788.17. One of these incorporated FDCPA provisions is that which prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." *See* 15 U.S.C. § 1692e.

Chase argues that the RFDCPA simply does not apply here for two reasons: first, because Plaintiffs' mortgage loan is a not a "debt"; and second, because Chase is not a "debt collector." (Motion, ECF No. 16 at 20.[7]) For its first argument, Chase cites a district court opinion which follows several other district court opinions and concludes that "[a] residential home loan is not a 'debt' under the [RFDCPA]." *Rose v. J.P. Morgan Chase, N.A.*, No. CIV. 2:12-225 WBS CMK, 2012 WL 892282, at *4 (E.D. Cal. Mar. 14, 2012) (citing *Morgera v. Countrywide Home Loans, Inc.*, No. 2:09-cv-01476-MCE-GGH, 2010 WL 160348, at *3 (E.D. Cal. Jan.11, 2010); *Ricon v. Recontrust Co.*, No. 09cv937-IEG-JMA, 2009 WL 2407396, at *4 (S.D. Cal. Aug. 4, 2009); *Pittman*

---

[7] Chase did not argue in its motion that it also did not engage in "debt collection," but Plaintiffs nevertheless argued in their opposition that Chase did in fact do so. (*Compare* Motion, ECF No. 16 at 20 *with* Opposition, ECF No. 22 at 18.) Thus, Chase argued in its reply that it did not engage in "debt collection." (*See* Reply, ECF No. 23 at 13-14.) It is true, as Chase points out, that the mere allegation that a defendant foreclosed on a deed of trust is not sufficient to state a claim under the RFDCPA (or the federal Fair Debt Collection Practices Act, for that matter). *See, e.g.*, *Agbowo v. Nationstar Mortg. LLC*, No. C 14–01295 LB, 2015 WL 628333, at *8-9 (N.D. Cal. Feb. 12, 2015); *Reyes*, 2011 WL 30759, at *19. But "[w]here the claim arises out of debt collection activities 'beyond the scope of the ordinary foreclosure process,' . . . a remedy may be available under the [RFDCPA]." *Reyes*, 2011 WL 30759, at *19 (citing *Walters*, 730 F. Supp. 2d at 1203 (holding that a mortgage servicer that regularly billed the plaintiff and collected payments on her mortgage debt was a "debt collector" under the RFDCPA and that the plaintiff stated an RFDCPA claim based on the allegation that mortgage servicer engaged in pattern of improper conduct that ultimately resulted in foreclosure)). Here, Plaintiffs' RFDCPA claim is based on Chase's allegedly improper billing and collection practices, not on its foreclosure on their home. The court therefore rejects Chase's argument in its reply that it did not engage in "debt collection."

1    *v. Barclays Capital Real Estate, Inc.*, No. 09 CV 0241 JM (AJB), 2009 WL 1108889, at *3 (S.D.

2    Cal. Apr. 24, 2009)).[8]

3          Despite these opinions, the court is not persuaded by Chase's argument.  Under the RFDCPA, a

4    "debt collector" is defined as "any person who, in the ordinary course of business, regularly, on

5    behalf of himself or herself or others, engages in debt collection."  Cal. Civ. Code § 1788.2(c).

6    "Debt collection," in turn, is defined as "any act or practice in connection with the collection of

7    consumer debts."  Cal. Civ. Code § 1788.2(b).  "Debt" is defined as "money, property or their

8    equivalent which is due or owing or alleged to be due or owing from a natural person to another

9    person."  Cal. Civ. Code § 1788.2(d). And "consumer debt" is defined as "money, property or their

10   equivalent, due or owing or alleged to be due or owing from a natural person by reason of a

11   consumer credit transaction."  Cal. Civ. Code § 1788.2(f).  A "consumer credit transaction" is "a

12   transaction between a natural person and another person in which property, services or money is

13   acquired on credit by that natural person from such other person primarily for personal, family, or

14   household purposes."  Cal. Civ. Code § 1788.2(e).  Upon consideration of these broad definitions,

15   the court does not see why a mortgage loan would not be covered by them.  *See Lopez v. AM*

16   *Solutions, LLC*, 5:13-cv-01689-SVW-SP, 2014 WL 1272773, at *3 (Mar. 3, 2014) ("A home equity

17   loan appears to fall within" these definitions.)

18         Moreover, as one court has pointed out, the federal district courts that concluded that a

19   residential mortgage loan is not a debt under the RFDCPA did so based "on other district court

20   decisions holding that 'foreclosure does not constitute debt collection under the [RFDCPA].'"

21   *Lopez*, 2014 WL 1272773, at *3 (citing *Izenberg v. ETS Services, LLC*, 589 F. Supp. 2d 1193, 1199

22   (C.D. Cal. 2008)).  The opinions Chase cites did so, too.  *See Morgera*, 2010 WL 160348, at *3

23   (after noting that "California courts have declined to regard a residential mortgage loan as a 'debt'

24

25

26        [8] *Rose* also cites *Rosal v. First Fed. Bank of Cal.*, 671 F. Supp. 2d 1111 (N.D. Cal. July 15,
     2009), for its conclusion that a residential home loan is not a debt under the RFDCPA, but *Rosal*

27   never discusses this issue.  *See Rose*, 2012 WL 892282, at *4 (citing *Rosal*, 671 F. Supp. 2d at
     1135).  Instead, the court in *Rosal* dismissed the plaintiff's RFDCPA claim because the plaintiff

28   could not allege that the defendant was a "debt collector" that was engaged in "debt collection."  *See*
     *Rosal*, 671 F. Supp. 2d at 1135.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  under the RFDCPA," concluding, "[a]s such, a foreclosure does not qualify as an unfair debt

2  collection"); *Ricon*, 2009 WL 2407396, at *4 (although the court states that "[t]he [RFDCPA]

3  regulates the collection of 'consumer debts,' which are transactions in which 'property, services or

4  money is acquired on credit . . . primarily for personal, family, or household purposes,'" it dismisses

5  the plaintiffs' RFDCPA claim because the RFDCPA "does not apply to lenders foreclosing on a

6  deed of trust"); *Pittman*, 2009 WL 1108889, at *3 (after stating that the RFDCPA "protects

7  consumers from debt collection practices for 'consumer debts,' created through transactions in

8  which 'property, services or money is acquired on credit . . . primarily for personal, family, or

9  household purposes,'" concluding that "foreclosing on a deed of trust does not invoke the statutory

10  protections").  But as the court in *Lopez* notes, concluding that foreclosure does not constitute debt

11  collection is different than concluding that a mortgage loan does not constitute a debt subject to the

12  RFFCPA.  2014 WL 1272773, at *3.  Indeed, after considering opinions like the ones cited by Chase

13  here, a court in this district determined that such opinions "are incorrect to the extent they suggest

14  that collection on a mortgage debt can *never* give rise to a claim under the [RFDCPA], or that a loan

15  service can *never* be a debt collector under that statute."  *Reyes v. Wells Fargo Bank, N.A.*, No. C-

16  10-01667 JCS, 2011 WL 30759, at *19 n.8 (N.D. Cal. Jan. 3, 2011) (italics in original).  "Rather,"

17  the court went on, "in light of the broad definition of 'debt' and 'debt collector' under the

18  [RFDCPA], the Court concludes that the proper inquiry should focus on the alleged conduct of the

19  entity."  *Id.*  At least one other court has followed suit.  *See Gross v. Wells Fargo Bank*, No. 13-cv-

20  1250-W(BGS), 2014 WL 232272, at *3 (S.D. Cal. Jan. 21, 2014) ("Wells Fargo cites several cases

21  in which district courts appear to have held that a mortgage loan does not qualify as debt.  However,

22  such a bright-line rule belies a plain reading of the statute.").  The court also does so now and rejects

23  Chase's argument that a mortgage loan cannot constitute a debt under the RFDCPA.

24  　　　Chase's second argument also is unavailing.  Citing *Lal v. American Homes Servicing, Inc.*, 680

25  F. Supp. 2d 1218, 1224 (E.D. Cal. 2010), and *Heflebower v. JP Morgan Chase, N.A.*, No. 1:12-CV-

26  1671 AWI SMS, 2014 WL 897352, at *11 (E.D. Cal. Mar. 6, 2014), Chase says that the RFDCPA

27  "mirrors" the FDCPA, and that the FDCPA's definition of "debt collector" "does not include the

28  consumer's creditors, a mortgage servicing company, or any assignee of the debt."  The RFDCPA,

1  however, does not exactly mirror the FDCPA.  While it does incorporate several provisions of the

2  FDCPA, the RFDCPA contains its own definition of "debt collector," and that definition is broader

3  than the one found in the FDCPA.  *Compare* Cal. Civ. Code § 1788.2(c) *with* 15 U.S.C.A. §

4  1692a(6); *see also Reyes*, 2011 WL 30759, at 19 ("As a number of courts have recognized, the

5  definition of 'debt collector' is broader under the [RFDCPA] than it is under the FDCPA, as the

6  latter excludes creditors collecting on their own debts.") (citations omitted).  Chase provides the

7  court with no reason why it does not fall within the RFDCPA's, as opposed to the FDCPA's,

8  definition of "debt collector," and the court does not see one.  *See Walters v. Fidelity Mortg. of Cal.,*

9  *Inc.*, 730 F. Supp. 2d 1185, 1203 (E.D. Cal. 2010) ("Here, plaintiff alleges that Ocwen regularly

10  billed her and collected payments on her mortgage loan debt from 2004 through 2009.  Thus,

11  plaintiff pleads sufficient facts to show that Ocwen is a 'debt collector' under the RFDCPA.")

12  (internal citation omitted).

13      Finally, Chase argues that, even if the RFDCPA does apply, Plaintiffs "have not described any

14  conduct that allegedly violated the [RFDCPA's] liability provisions."  (Motion, ECF No. 16 at 20.)

15  As explained above, the RFDCPA incorporates the FDCPA's provision prohibiting debt collectors

16  from using "any false, deceptive, or misleading representation or means in connection with the

17  collection of any debt."  *See* 15 U.S.C. § 1692e.  Plaintiffs' RFDCPA claim incorporates the

18  preceding paragraphs in their First Amended Complaint, and those paragraphs sufficiently allege

19  that Chase made allegedly false, deceptive, or misleading representations with respect to its attempts

20  to bill and collect from Plaintiffs.

21      For the reasons explained above, the court finds that Plaintiffs sufficiently allege a claim against

22  Chase for violating the RFDCPA.

23      **E.  UCL**

24      Plaintiffs' fifth claim is for violation of California's Unfair Competition Law, Cal. Bus. & Prof.

25  Code § 17200, et seq.  (FAC ¶¶ 66-69.)  The UCL prohibits any "unlawful, unfair or fraudulent

26  business act or practice."  Cal. Bus. & Prof. Code § 17200.  "[Because] section 17200 is [written] in

27  the disjunctive, it establishes three separate types of unfair competition.  The statute prohibits

28  practices that are either 'unfair' or 'unlawful,' or 'fraudulent.'"  *Pastoria v. Nationwide Ins.*, 112

1    Cal. App. 4th 1490, 1496 (2003); *see also Cel–Tech Communications, Inc. v. Los Angeles Cellular*

2    *Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  To support a claim for a violation of the UCL, a plaintiff

3    cannot simply rely on general common law principles.  *Textron Fin. Corp. v. Nat'l Union Fire Ins.*

4    *Co. of Pittsburgh*, 118 Cal. App. 4th 1061, 1072 (2004).

5        The UCL incorporates other laws and treats violations of those laws as unlawful business

6    practices independently actionable under state law.  *Chabner v. United Omaha Life Ins. Co.*, 225

7    F.3d 1042, 1048 (9th Cir. 2000).  Violation of almost any federal, state, or local law may serve as the

8    basis for a UCL claim.  *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994).  In

9    addition, a business practice may be "unfair or fraudulent in violation of the UCL even if the

10   practice does not violate any law."  *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 827 (2003).

11       Plaintiffs allege that Chase committed all three types of unfair competition.  (FAC ¶ 68.)  Chase

12   argues that Plaintiffs' claim fails because they lack standing to bring a UCL claim and, even if they

13   have standing, their claim is not sufficiently alleged.  (Motion, ECF No. 16 at 21-24.)

14       As for Chase's first argument, any individual who has "has suffered injury in fact and has lost

15   money or property as a result of the unfair competition" may initiate suit.  Cal. Bus. & Prof. Code §

16   17204.  To have standing, a plaintiff must sufficiently allege that (1) he has "lost 'money or

17   property' sufficient to constitute an 'injury in fact' under Article III of the Constitution" and (2)

18   there is a "causal connection" between the defendant's alleged UCL violation and the plaintiff's

19   injury in fact.  *Rubio v. Capital One Bank,* 613 F.3d 1195, 1203-04 (9th Cir. 2010) (citations

20   omitted); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (Cal. 2011) ("To satisfy the

21   narrower standing requirements imposed by Proposition 64, a party must now (1) establish a loss or

22   deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2)

23   show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false

24   advertising that is the gravamen of the claim.) (italics in original).

25       Chase contends that Plaintiffs have not suffered an economic injury because Plaintiffs have not

26   lost any money due to the parties' dispute about how much Plaintiffs must pay to reinstate their

27   mortgage loan and because Plaintiffs' Property has not yet been sold at a trustee's sale.  Chase also

28   contends that, even if Plaintiffs have suffered economic injury, that injury was not caused by

1   Chase's conduct.  Plaintiffs' Property is in foreclosure, Chase says, because Plaintiffs failed to make

2   their mortgage payments, not because of anything Chase did.

3       In their opposition, Plaintiffs say that Chase's debt collection and foreclosure acts, and its refusal

4   to correct the errors, have injured them because they cannot refinance their Property to take

5   advantage of low interest rates as long as the notice of default and notice of trustee's sale are

6   recorded and because they cannot sell the Property and receive the current market rate.  (Opposition,

7   ECF No. 22 at 20; *see* FAC ¶ 75.)  In addition, the court highlights that Plaintiffs allege that, if it

8   were not for Chase's erroneous charges, they could and would pay the amount required to reinstate

9   their loan (and thereby take their loan out of foreclosure.  (*See* FAC ¶ 23.)  This is sufficient to

10  show standing under the UCL.

11      As for Chase's second argument, the court must address each type of unfair competition

12  separately.  The court first considers Plaintiffs' "unlawful" UCL claim.  "To state a cause of action

13  based on an unlawful business act or practice under the UCL, a plaintiff must allege facts sufficient

14  to show a violation of some underlying law."  *Finuliar v. BAC Home Loans Servicing, L.P.*, No. C-

15  11-02629 JCS, 2011 WL 4405659, at *9 (N.D. Cal. Sep. 21, 2011) (citing *People v. McKale*, 25

16  Cal.3d 626, 635 (1979)).  Here, the court already has ruled that Plaintiffs' RESPA and RFDCPA

17  claims survive, and this means that Plaintiffs' "unlawful" UCL claim survives, too.

18      The court next considers Plaintiffs' "unfair" UCL claim.  As the district court in *Phipps v. Wells*

19  *Fargo* has explained:

20          In consumer cases, such as this, the California Supreme Court has not established
            a definitive test to determine whether a business practice is unfair.  *Drum v. San*
21      *Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256, 106 Cal. Rptr. 3d 46 (2010).
        A split of authority has developed among the California Courts of Appeal, which
22      have applied three tests for unfairness in consumer cases.  *Drum*, 182 Cal. App. 4th at
        256, 106 Cal. Rptr.3d 46.

23
            The test applied in one line of cases requires "that the public policy which is a
24      predicate to a consumer unfair competition action under the 'unfair' prong of the
        UCL must be tethered to specific constitutional, statutory, or regulatory provisions."
25      *Drum*, 182 Cal. App. 4th at 256, 106 Cal. Rptr.3d 46 (citing *Bardin v.*
        *Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1260–1261, 39 Cal. Rptr.3d 634
26      (2006); *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th at 581, 595–596, 101 Cal.
        Rptr.3d 697 (2009); *Gregory v. Albertson's Inc.*, 104 Cal. App. 4th 845, 854, 128 Cal.
27      Rptr.2d 389 (2002).

28          . . .

> A second line of cases applies a test to determine whether the alleged business practice "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum*, 182 Cal. App. 4th at 257, 106 Cal. Rptr.3d 46 (citing *Bardin*, 136 Cal. App. 4th at 1260, 39 Cal. Rptr.3d 634; *Davis*, 179 Cal. App. 4th at 594–595, 101 Cal. Rptr.3d 697)).
>
> . . .
>
> The test applied in a third line of cases draws on the definition of "unfair" in section 5 of the Federal Trade Commission Act (15 U.S.C. § 45, subd. (n)), and requires that "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Drum*, 182 Cal. App. 4th at 257, 106 Cal. Rptr.3d 46 (citing *Davis*, 179 Cal. App. 4th 597–598, 101 Cal. Rptr.3d 697; *Camacho v. Automobile Club of Southern California*, 142 Cal. App. 4th 1394, 1403, 48 Cal. Rptr.3d 770 (2006)).

*Phipps v. Wells Fargo*, No. CV F 10-2025 LJO SKO, 2011 WL 302803, at *16 (E.D. Cal. Jan.27, 2011). Here, Plaintiffs highlight that they allege that Chase has improperly charged them escrow fees and demanded they pay an amount in excess of what they actually owe. In its reply, Chase points out that, to support their statement, Plaintiffs cite to paragraphs found within the breach of contract claim in their First Amended Complaint and do not cite to any paragraphs within their UCL claim. This is true, but it is equally true that Plaintiffs' UCL claim incorporates their preceding paragraphs, and the court finds that these allegations are sufficient under the standards described above in *Phipps*. (*See* FAC ¶¶ 50-53, 66.) Chase's acts form the basis of Plaintiffs' other claims, and the court does not see any utility or countervailing benefit to Chase. The court concludes that Plaintiffs' "unfair" UCL claim survives.

Finally, the court considers Plaintiffs' "fraudulent" UCL claim. "[T]o state a claim under the UCL based on fraudulent conduct, [a p]laintiff must allege, with particularity, facts sufficient to establish that the public would likely be deceived by Defendants' conduct." *Finiliar*, 2011 WL 4405659, at *10. "'Fraudulent,' as used in the statute, does not refer to the common law tort of fraud but only requires a showing members of the public 'are likely to be deceived.'" *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 839 (Cal. Ct. App. 1994 (quoting Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1267 (Cal. 1992)) (internal quotation marks omitted). Also, "UCL claims premised on fraudulent conduct trigger the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure." *Finiliar*, 2011 WL 4405659, at *10 (citing *Kearns v. Ford*

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  *Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)).

2      Plaintiffs do not address Chase's arguments about this claim in their opposition.  (*See*

3  Opposition, ECF No. 22 at 20-21 (featuring only subsections addressing their "unlawful" and

4  "unfair" UCL claims).)  The court considers Plaintiffs' failure to do so as an abandonment of the

5  claim.  *See Smith v. Harrington*, No. C 12-03533 LB, 2013 WL 132465, at *10 (N.D. Cal. Jan. 9,

6  2013) (citing *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (plaintiff

7  abandoned two claims by not raising them in opposition to the County's motion for summary

8  judgment); *Green Desert Oil Group v. BP West Coast Prods.*, No. C 11-02087 CRB, 2012 WL

9  555045, at *2 (N.D. Cal. Feb. 21, 2012) (complaint alleged many breaches of contract; defendant

10  moved to dismiss them all; plaintiffs defended only three of the alleged breaches in their opposition;

11  court deemed the ones not addressed to be abandoned); *Qureshi v. Countrywide Home Loans, Inc.*,

12  No. 09-4198, 2010 WL 841669, at *6 n.2 (N.D. Cal. Mar. 10, 2010) (deeming plaintiff's failure to

13  address, in his opposition brief, the claims challenged in a motion to dismiss to be an "abandonment

14  of those claims")).  And in instances where a plaintiff simply fails to address a particular claim in its

15  opposition to a motion to dismiss that claim, courts generally dismiss it with prejudice.  *See Smith*,

16  2013 WL 132465, at *11 (citing *In re Hulu Privacy Litig.*, No. C 11–03764 LB, 2012 WL 2119193,

17  at *3 (N.D. Cal. June 11, 2012) (discussing case law on this issue)).  As Plaintiffs did not address

18  their "fraudulent" UCL claim at all in their opposition, the court sees no reason to depart from this

19  usual outcome.  Accordingly, the court dismisses with prejudice Plaintiffs' "fraudulent" UCL claim.

20  **F. Financial Elder Abuse**

21      Plaintiffs' sixth claim, which is brought by Ms. Salehi-Had only, is for financial elder abuse in

22  violation of California Welfare and Institutions Code § 15610.30.  (FAC ¶¶ 70-80.)  That statute

23  provides:

24          (a) "Financial abuse" of an elder or dependent adult occurs when a person or entity
        does any of the following:

25

26          (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an
        elder or dependent adult for a wrongful use or with intent to defraud, or both.

27          (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or
        personal property of an elder or dependent adult for a wrongful use or with intent

28          to defraud, or both.

(3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70.

(b) A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult.

(c) For purposes of this section, a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult.

(d) For purposes of this section, "representative" means a person or entity that is either of the following:

(1) A conservator, trustee, or other representative of the estate of an elder or dependent adult.

(2) An attorney-in-fact of an elder or dependent adult who acts within the authority of the power of attorney.

Cal. Wel. & Inst. Code § 15610.30.

Chase makes three arguments. First, it argues that Plaintiffs' claim fails because Plaintiffs do not allege that Ms. Salehi-Had was "deprived of a property right," as required by section 15610.30(c). Plaintiffs allege that, as a result of Chase's continual requests for money Plaintiffs do not owe, Plaintiffs' property remains in foreclosure, and this has prevented Ms. Salehi-Had "from refinancing or taking any other transfer action relating to her [Property], including selling it for market value." (FAC ¶ 75.) Chase contends that these allegations do not show that Ms. Salehi-Had has been deprived of a property right because, even though the Property is in foreclosure, a trustee's sale has not yet occurred (and thus she still owns the Property), and because her inability to refinance the Property or sell it for market value is not a wrongful taking of property.

The court does not see it this way. As the California Court of Appeal, Second District, made clear after examining section 15610.30(c) in detail last year, the "impairment" of a plaintiff's ability "to sell . . . real property for fair market value or to use it as security to obtain a loan on reasonable and commercially acceptable terms" can constitute the deprivation of a property right for purposes of the elder financial abuse statute. *Bounds v. Superior Court*, 229 Cal. App. 4th 468, 480 Cal. Ct.

App. 2014) (the petitioners' allegations regarding the adverse financial impact of escrow instructions were sufficient to allege the deprivation of a property right because the petitioners were "deprived of one of the incidents of property ownership: the right to strike the best bargain possible in either selling or encumbering the real property").[9]  In reply, Chase tries to distinguish *Bounds* by pointing out that *Bounds* did not arise in the mortgage or foreclosure context, but the court sees no meaningful reason why this negates *Bounds*'s reasoning or conclusion on this issue.  Chase also argues in reply that *Bounds* is distinguishable because in *Bounds* it was clear that it was the defendants' acts that caused the plaintiff's property right to be impaired, but in this case it is Plaintiffs' failure to timely make their mortgage payments, and not Chase's conduct, that caused the Property to go into foreclosure.  This argument, however, ignores Plaintiffs' allegation that the Property remains in foreclosure because they cannot pay to reinstate the loan as long as Chase continues to demand that they pay more than they owe.  (*See* FAC ¶ 23.)  Plaintiffs allege that if the proper reinstatement amount is determined, they can and will pay to reinstate the loan.  (*Id.*)

In their reply, and ostensibly as a way to distinguish *Bounds*, Chase also argues that financial elder abuse claims under section 15610.30 are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.  (Reply, ECF No. 23 at 17.)  The court is not convinced that Chase's categorical statement is true in all cases.  The federal district court opinion Chase cites, *Lintz v. Bank of America*, No.: 5:13-CV-01757-EJD, 2013 WL 5423873 (N.D. Cal. Sept. 27, 2013), does in fact say that financial elder abuse claims must be pleaded with particularity.  *Id.* at *8.  In support, *Lintz* cites another federal district court opinion, *Chavers v. GMAC Mortg., LLC*, No. 2:11-cv-01097-ODW (SSx), 2012 WL 2343202 (C.D. Cal. June 20, 2012).  *Chavers* says that financial elder abuse claims must be pleaded with particularity because they are "largely grounded in fraud," and for support it cites *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1103-05 (9th Cir. 2003), and *Delaney v. Baker*, 20 Cal. 4th 23 (Cal. 1999).  *Chavers*, 2012 WL 2343202 at *7.  In *Vess*, the Ninth

_____

[9] Chase cites a federal district court opinion, *Kouretas v. Nationstar Mortg. Holdings, Inc.*, No. 2:13-cv-02632-MCE-KJN, 2014 WL 4109623 (Aug. 19, 2014), which suggests that there is no deprivation of a property right until a trustee's sale occurs, but that opinion was issued before *Bounds* and in any event does not cite to any California authority for its conclusion and does not explore the issue in any detail.

1   Circuit stated that claims that are "grounded in fraud," even if they are not claims for fraud, are

2   subject to Rule 9(b).  317 F.3d at 1103-04.  But it does not say that all financial elder abuse claims

3   are grounded in fraud.  And while *Delaney*, which *Chavers* cited without pointing to any specific

4   page, does discuss elder abuse claims, it does not appear to state that all financial elder abuse claims

5   are grounded in fraud or are subject to a heightened pleading standard.  *See* 20 Cal. 4th 23.

6        Second, Chase argues that Plaintiffs' claim fails because Plaintiffs do not sufficiently allege that

7   Chase took the Property "for a wrongful use or with intent to defraud, or both," as required by

8   section 15610.30(a)(1) or (2).  In their opposition, Plaintiffs say that they are not required to allege

9   that Chase took the Property for a wrongful use or with intent to defraud because, under section

10  15610.30(a)(3), they merely have to allege that Chase took the Property "by undue influence, as

11  defined in Section 15610.70."  Section 15610.70, in turn, provides that:

12          (a) "Undue influence" means excessive persuasion that causes another person to act
            or refrain from acting by overcoming that person's free will and results in inequity.  In
13          determining whether a result was produced by undue influence, all of the following
            shall be considered:

14          (1) The vulnerability of the victim.  Evidence of vulnerability may include, but is
15          not limited to, incapacity, illness, disability, injury, age, education, impaired
            cognitive function, emotional distress, isolation, or dependency, and whether the
16          influencer knew or should have known of the alleged victim's vulnerability.

17          (2) The influencer's apparent authority.  Evidence of apparent authority may
            include, but is not limited to, status as a fiduciary, family member, care provider,
18          health care professional, legal professional, spiritual adviser, expert, or other
            qualification.

19
            (3) The actions or tactics used by the influencer.  Evidence of actions or tactics
20          used may include, but is not limited to, all of the following:

21              (A) Controlling necessaries of life, medication, the victim's interactions with
                others, access to information, or sleep.
22
                (B) Use of affection, intimidation, or coercion.
23
                (C) Initiation of changes in personal or property rights, use of haste or secrecy
24              in effecting those changes, effecting changes at inappropriate times and
                places, and claims of expertise in effecting changes.
25
            (4) The equity of the result.  Evidence of the equity of the result may include, but
26          is not limited to, the economic consequences to the victim, any divergence from
            the victim's prior intent or course of conduct or dealing, the relationship of the
27          value conveyed to the value of any services or consideration received, or the
            appropriateness of the change in light of the length and nature of the relationship.
28
            (b) Evidence of an inequitable result, without more, is not sufficient to prove undue

influence.

As Chase highlights in its reply, nowhere in the First Amended Complaint do Plaintiffs allege, whether explicitly or implicitly, that Chase used excessive persuasion that caused Ms. Salehi-Had to act or refrain from acting by overcoming Ms. Salehi-Had's free will and resulted in inequity. Indeed, the First Amended Complaint is devoid of any allegations regarding Chase's undue influence. As currently pleaded, then, Plaintiffs fail to sufficiently allege a claim for financial elder abuse under any prong of section 15610.30(a).

Third, Chase argues that Plaintiffs' claim fails because Plaintiffs do not sufficiently allege that Ms. Salehi-Had is an "elder," which is defined as "any person residing in this state, 65 years of age or older." Cal. Wel. & Inst. Code § 15610.27. It is right. While Plaintiffs do allege that Ms. Salehi-Had is an "elder" and state that, as of the date the First Amended Complaint was filed, she was over the age of 65, they never allege her age and thus do not show that she actually was an elder at the time of the alleged violations. Plaintiffs state her age in their opposition, but at this stage the court is confined to allegations in the First Amended Complaint. That said, their statement suggests that they could get past this problem upon amendment.

For the foregoing reasons, the court concludes that Plaintiffs' financial elder abuse claim, as currently pleaded, fails and must be dismissed. Because amendment is not clearly futile, the court dismisses it without prejudice.

### G.  Intentional Infliction of Emotional Distress

Plaintiffs' seventh claim is for intentional infliction of emotional distress. (FAC ¶¶ 81-84.) In California, "[a] cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Kelley v. Conco Companies*, 196 Cal. App. 4th 191, 215 (2011). "A defendant's conduct is outrageous when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (internal quotation marks omitted).

Chase argues that Plaintiffs do not, and cannot, sufficiently allege any extreme and outrageous

1   conduct by Chase; that Chase intended to cause, or recklessly disregarded the probability to cause,

2   emotional distress; or that Plaintiffs suffered severe or extreme emotional distress.  The court agrees

3   on all accounts.  Plaintiffs allege, and reiterate in their opposition, that Chase's servicing errors,

4   which it has been on notice of since 2012, have negatively impacted their credit score and caused

5   them to be unable to refinance the Property at advantageous interest rates or to sell the Property at

6   the current market rate.  This is not enough.  As Chase points out, "multiple California district courts

7   have held that the act of foreclosing on a home does not qualify as the type of extreme behavior that

8   supports an [intentional infliction of emotional distress] claim absent allegations of bad faith."

9   *Kennedy v. World Savings Bank, FSB*, No.: 14-cv-05516-JSC, 2015 WL 1814634, at *9 (N.D. Cal.

10  Apr. 21, 2015) (citing *Helmer v. Bank of America, N.A.*, No. 2:12-CV-00799-TLN-CKD, 2013 WL

11  4546285, at *8 (E.D. Cal. Aug. 27, 2013); *Quinteros v. Aurora Loan Servs.*, 740 F. Supp. 2d 1163,

12  1172 (E.D. Cal. 2010); *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 884 (N.D. Cal.

13  2010)).  Moreover, Plaintiffs' allegation of Chase's intent is conclusory and is not supported by

14  Plaintiffs' earlier allegations, either.  Finally, Plaintiffs cite no authority holding that their distress

15  over Chase's servicing errors and foreclosure is severe or extreme, as those terms are understood in

16  the context of a claim for intentional infliction of emotional distress.  Accordingly, Plaintiffs' claim

17  fails and the court dismisses it with prejudice.

18  **H.  Declaratory Relief**

19      Plaintiffs' first claim is for declaratory relief.  (FAC ¶¶ 45-48.)  As an initial matter, the court

20  must determine whether California's Declaratory Relief Act, Cal. Code Civ. Proc. § 1060, or the

21  federal Declaratory Judgment Act, 28 U.S.C. § 2201, applies to this diversity action.  One court in

22  this district has explained the issue thusly:

23          . . . Although district courts in the Ninth Circuit have at times applied the California
            Declaratory Relief Act when sitting in diversity, *see Valley Forge Ins. Co. v. APL Co.*
24          *Pte. Ltd.*, No. 09-9323, 2010 WL 960341, at *4 n.5 (C.D. Cal. Mar. 16, 2010) (citing
            cases), other district courts apply the federal Act, *see, e.g.*, *DeFeo v. Procter &*
25          *Gamble Co.*, 831 F. Supp. 776, 779 (N.D. Cal. 1993) ("The propriety of granting
            declaratory relief in federal court is a procedural matter. . . .  Therefore, the
26          Declaratory Judgment Act is implicated even in diversity cases . . . .") (citations
            omitted).  For its part, the Ninth Circuit has indicated, although not explicitly held,
27          that the federal Declaratory Judgment Act should apply.  In *Golden Eagle Insurance*
            *Co. v. Travelers Cos.*, 103 F.3d 750, 753 (9th Cir. 1996), *overruled on other grounds*
28          *by Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220 (1998) (en banc), the Ninth Circuit
            stated that although "[t]he complaint [plaintiff] filed in state court was for declaratory

1   relief under California's declaratory relief statute," "[w]hen [defendant] removed the
2   case to federal court, based on diversity of citizenship, the claim remained one for
    declaratory relief, but the question whether to exercise federal jurisdiction to resolve
3   the controversy became a procedural question of federal law." Finally, the U.S.
    Supreme Court has emphasized the procedural nature of the Declaratory Judgment
4   Act, which further supports the conclusion that the federal Act applies. *See Skelly Oil
    Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950)
5   ( "'[T]he operation of the Declaratory Judgment Act is procedural only.'" (quoting
    *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617
6   (1937))).

7   *In re Adobe Sys., Inc. Privacy Litig.*, No.: 13-CV-05226-LHK, -- F. Supp. 3d ----, 2014 WL

8   4379916, at *11 (N.D. Cal. Sept. 4, 2014). Based on these authorities, the court concluded that the

9   federal Declaratory Judgment Act applied. *Id.* It also noted, as a practical matter, whether the state

10  or federal statute applied made little difference because the two statutes are broadly equivalent. *Id.*

11  This court similarly concludes that the federal Declaratory Judgment Act applies in this action.

12  With that resolved, the court addresses the claim. The federal Declaratory Judgment Act

13  provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United

14  States . . . may declare the rights and other legal relations of any interested party seeking such

15  declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "To fall

16  within the Act's ambit, the 'case of actual controversy' must be 'definite and concrete, touching the

17  legal relations of parties having adverse legal interests,' . . . 'real and substantial' and 'admi[t] of

18  specific relief through a decree of a conclusive character, as distinguished from an opinion advising

19  what the law would be upon a hypothetical state of facts.'" *MedImmune, Inc. v. Genentech, Inc.*,

20  549 U.S. 118, 127 (2007) (internal quotation marks omitted) (quoting *Aetna Life Ins. Co. v.*

21  *Haworth*, 300 U.S. 227, 240-41 (1937)).

22  Chase first argues that Plaintiffs' claim fails because they do not state any other independently

23  viable claim. This argument fails as the court has ruled that several of Plaintiffs' claims survive

24  Chase's motion to dismiss. *See Wolf v. Wells Fargo Bank, N.A.*, No. C11-01337 WHA, 2011 WL

25  4831208, at *10 (N.D. Cal. Oct. 12, 2011) ("Plaintiff's operative complaint sought declaratory relief.

26   This claim is actually a request for remedy—to weigh it, the court must look to its underlying

27  claims. Until plaintiff's claims are finally determined, it is impossible for this order to say that

28  declaratory relief will not be in order.") (citing *Boeing Co. v. Cascades Corp.*, 207 F.3d 1177, 1192

UNITED STATES DISTRICT COURT
For the Northern District of California

1    (9th Cir. 2000)).

2         Chase next argues that Plaintiffs do not specify the type of declaration they seek and so the court

3    cannot grant the relief they want without issuing an advisory opinion.  "The Supreme Court has

4    admitted that 'not . . . the brightest of lines' separates cases that satisfy the statutory jurisdictional

5    requirements and those that do not."  *In re Adobe*, 2014 WL 4379916, at *13 (quoting *MedImmune*,

6    549 U.S. at 127).  "The central question, however, is whether 'the facts alleged, under all the

7    circumstances, show that there is a substantial controversy, between parties having adverse legal

8    interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *In*

9    *re Adobe*, 2014 WL 4379916, at *13 (quoting *MedImmune*, 549 U.S. at 127) (internal quotation

10   marks omitted). In their First Amended Complaint, Plaintiffs allege: "A real and present controversy

11   exists between Plaintiffs and Chase as to the monthly payment amount that became due under the

12   promissory note at the time when Chase force placed insurance on Plaintiffs.  Plaintiffs claim that

13   the new monthly payment was in excess to what was rightfully allowed as per the Promissory Note.

14   Chase claims Plaintiffs owed additional payments as per the escrow delinquency."  (FAC ¶¶ 47-49.)

15   Although they do not state exactly what they want the court to declare, in either these paragraphs or

16   their prayer for relief, it is quite apparent that they want the court to determine how much they owe

17   on their mortgage and what they need to pay each month.  This is sufficient.

18        Finally, Chase argues that the issues raised by Plaintiffs' declaratory relief claim can be decided

19   with respect to their other claims.  For support, it emphasizes that whether to apply the Declaratory

20   Judgment Act is within the court's discretion.  This is true, and in this case the court will exercise

21   that discretion.  Plaintiffs' declaratory relief claim survives.

## CONCLUSION

23        Based on the foregoing, the court grants in part and denies in part Chase's motion.  Plaintiffs'

24   "fraudulent" UCL and intentional infliction of emotional distress claims are dismissed with

25   prejudice, their breach of contract and financial elder abuse claims are dismissed without prejudice,

26   and their RESPA, RFDCPA, "unlawful" and "unfair" UCL, declaratory relief claims survive.

27   Plaintiffs may file any Second Amended Complaint by May 25, 2015.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**IT IS SO ORDERED.**

Dated: May 1, 2015

_____
LAUREL BEELER
United States Magistrate Judge